**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:09-CR-0072-03** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **DESHAWN LIVINGSTON** | : | |

## MEMORANDUM

Presently before the court are three motions filed by defendant DeShawn

Livingston ("Livingston") in anticipation of his criminal trial.  Livingston has

moved to (1) suppress physical evidence seized in connection with the investigation

into the above-captioned matter, (2) compel production of <u>Brady</u> material, and

(3) compel production of Rule 404(b) evidence.  (<u>See</u> Docs. 163, 165, 211.)  The court

held evidentiary hearings on Livingston's motion to suppress on January 22, 2010

and February 19, 2010.  (<u>See</u> Docs. 257, 264.)  For the reasons that follow, the

motions will be granted in part and denied in part.

## I.   <u>Findings of Fact</u>[1]

The events underlying the present motions date back to the morning of

April 20, 2008, when Richard Wilson ("Wilson"), a patrolman with the Susquehanna

Township police department, received notice of an incident of domestic violence.

(Doc. 257 at 4.)  The victim in the altercation identified herself as Jasmine Williams

and requested that Wilson meet her at a Shop & Drive convenience store located at

---

[1] These findings are based on the court's determination of credible testimony
presented at the evidentiary hearings held on January 22, 2010 and February 19,
2010, as well as the court's assessment of the documentary evidence of record.

the corners of Edgemont Road and Herr Street in Susquehanna Township. (Id.) Unbeknownst to Wilson at the time, the victim's actual name was Annelise Scherrer ("Scherrer"), but this was a fact she did not volunteer. (Id. at 10-11.)

Wilson met Scherrer at the Shop & Drive shortly after receiving her report. (Id. at 4.) He was accompanied by Richard Adams ("Adams"), a corporal with the Susquehanna Township police department. (Id. at 24.) Scherrer told the officers that Livingston, her live-in boyfriend, had been arrested for driving under the influence of alcohol in the early hours of the morning. (Id. at 6.) He then returned home high on crack cocaine, struck Scherrer in the face, and threatened to pistol whip her. (Id. at 5-6.) Both officers observed swelling on the right side of Scherrer's face consistent with her allegations. (Id. at 5, 25.)

After taking her statement, the officers informed Scherrer that they intended to proceed to the couple's apartment and arrest Livingston for simple assault. (Id. at 6, 26.) Scherrer then repeatedly warned the officers to proceed with caution. (Id. at 6-7.) According to Wilson,

> [S]he told us to be careful, that she said he's very violent and that he is scared of being robbed and that he has a gun under his bed, and that if he hears any noises that for his safety he always gets the gun for fear that he is going to be robbed.

(Id. at 6.) In addition, Scherrer provided Wilson with a key to the apartment and said, "this key opens the back door." (Id. at 6-7.) Wilson testified that he did not request the key, but that Scherrer simply "presented a key to me without me asking

her." (Id. at 8.)  Neither officer requested Scherrer's identification or any proof that she lived at the apartment with Livingston.[2]  (See id. at 15.)

Scherrer's characterization of Livingston as intoxicated and potentially violent led Wilson and Adams to request backup support and to equip themselves with bullet-resistant helmets.  (See id. at 8, 26-27.)  They were soon joined by three additional officers and immediately traveled to Livinston's apartment at 2004 Clayton Avenue.  (See id. at 8, 26-27.)  The officers approached the back door led by Adams, who was holding a large bullet-proof shield.  (Id. at 11, 29.)  Adams opened the back door using the key provided by Scherrer, identified that police were entering the apartment, and commanded Livingston to show himself.  (See id. at 11, 29.)  After repeating this instruction several times, the officers entered the apartment.  (See id. at 11-12.)

The back door opened into a narrow hallway, and as the officers cautiously proceeded forward, Adams continued to call out to Livingston.  (See id. at 11-12, 30-31.)  Finally, Livingston emerged in a doorway directly in front of the officers.  (Id. at 30.)  Adams told Livingston he was under arrest and to get on the floor.  (Id. at 30-31.)  For several seconds, Livingston did not move.  (See id. at 12, 31.)  Adams testified that he "seemed like he was processing what to do."  (Id. at 31.)  Rather

---

[2] During the exchange between Wilson and Scherrer, Adams was attempting to run background checks upon Livingston and the name "Jasmine Williams." (Doc. 257 at 41.)  Adams quickly discovered that Livingston had several prior arrests for narcotics possession, assault, and robbery.  (Id.)  Because the name "Jasmine Williams" was an alias, however, Adams' attempt to check her background was unproductive.

than obey Adams' command, however, Livingston began to move to his right, prompting Adams to "amp up" his directives. (See id. at 12, 31.) Livingston then laid down as ordered and the officers rushed forward to secure the area. (See id. at 12-13, 31.)

Wilson secured Livingston by applying handcuffs while Adams attempted to ensure no other individuals were present in the room. (See id. at 13.) Approximately four to six feet from where Livingston was lying was an inflated air mattress. (Id. at 12-13, 32.) Adams kicked the mattress, causing it to bounce into the air and revealing a loaded revolver that had been concealed beneath the mattress. (Id. at 32.) According to both officers, Wilson's restraint of Livingston was simultaneous to Adams' discovery of the firearm. (See id. at 19, 32-33.)

Wilson immediately transported Livingston out of the apartment and placed him into the back of a police cruiser. (Id. at 14.) After he was read his Miranda rights, Livingston explained that the name "Jasmine Williams" was an alias, relayed Scherrer's real name, and revealed that there were multiple warrants outstanding for her arrest. (Id.) When the officers returned to the Susquehanna Township police station, Adams verified that the information supplied by Livingston was accurate, confirming that there were numerous outstanding warrants for Scherrer's arrest and in excess of one thousand dollars in unpaid fines. (Id. at 14, 34.) Scherrer contacted Adams one hour later to inquire whether it was safe for her to return to the apartment and gather her possessions. (Id. at 14, 34.) Adams indicated that the apartment was secure and said that he would meet her at

the residence. (Id. at 14, 34.) When Scherrer arrived, Adams placed her under arrest. (Id. at 14, 34.)

Shortly after her arrest, Wilson transported Scherrer to the Dauphin County prison for temporary detention. (Id. at 21.) Scherrer told Wilson during the drive that Livingston was involved in at least one robbery in the city of Harrisburg. (Id. at 21-22.) Wilson relayed this information to John O'Connor ("O'Connor"), a detective with the Harrisburg police department. (Id. at 22, 44.) O'Connor then interviewed Scherrer, who told him about a robbery in which "an old lady [was] tied up and . . . the items that were taken were an X-Box 360, a Playstation, flat screen TVs, and that these guys were masked, [and] DeShawn had a mask in the house." (Id. at 45.) Scherrer's description was consistent with the circumstances surrounding an unsolved home invasion robbery that occurred on January 2, 2008, at 218 South 15th Street in Harrisburg.[3] (Id. at 44-45.) According to Scherrer, the stolen X-Box 360 and Playstation were still inside Livingston's apartment, along with the mask and camouflage gloves that Livingston wore during commission of the offense. (See id. at 46.) Scherrer also described a laptop computer within Livingston's residence; her description matched that belonging to a missing laptop from the January 2 robbery. (See id.)

---

[3] O'Connor testified that the January 2, 2008 robbery was perpetrated by masked individuals who bound the victim, Deborah Dobson, with cords from a Playstation gaming system. (Doc. 257 at 45.)

O'Connor immediately applied for and obtained a warrant to search Livingston's apartment.  (See id. at 46-47; see also Doc. 213-2.)  The warrant identified the following items to be seized:  (1) a black HP Compa[q] NX6110 laptop computer; (2) a Playstation 3 game set; (3) an X-Box 360; (4) a black ski mask; (5) green gloves; (6) a black hoodie; (7) black Timberland boots; and (8) any and all papers or photographs identifying an individual named "DC," who was believed to be Livingston's co-conspirator in the offense.  (See Doc. 213-2.)  O'Connor executed the warrant at 1:46 p.m. on April 21, 2008, and seized, *inter alia*, a black ski mask and brown gloves, black Timberland boots, one black hooded sweatshirt, an X-Box 360 and Playstation 3 gaming system, scales, and several documents identifying Livingston as the apartment's occupant.  (Id.)  O'Connor also seized a black Motorola cellular telephone, which was not identified in the warrant, but which matched the description of a cellular telephone stolen during the January 2 robbery.  (See Doc. 257 at 51.)

Contrary to Scherrer's assurances, however, O'Connor did not come upon a laptop computer during the apartment search.  (See id. at 55.)  O'Connor questioned Scherrer about this, and she told him that Livingston's mother, Constance Livingston ("Constance"), must have removed it from the residence. (Id.)  O'Connor and several detectives therefore traveled to Constance's home at 2022 Chestnut Street in Harrisburg to request that she turn over the computer. (See id.)  According to O'Connor, when Constance opened the front door, he said, "I

want the computer that you took out of 2004 Clayton Avenue, Apartment 4." (Id. at 60.)  Constance then complied and surrendered the laptop.  (Id. at 55.)

At some point over the course of the following week, O'Connor interviewed Scherrer again.  (See id. at 56, 65-66.)  She explained that Livingston's mother was in possession of a blue Ozark bag containing $20,000 in stolen cash.  (See Doc. 213-3.)  Based upon this information, O'Connor obtained a warrant to search Constance's home on April 29, 2008, and officers thereafter seized a wooden marijuana pipe, a shotgun, and a blue bag.  (See id.; see also Doc. 257 at 56.)  The blue bag contained no cash, and officers were unable to locate the $20,000 alluded to by Scherrer.  (Id. at 65-66.)

On February 25, 2009, Livingston was indicted by a grand jury.  The indictment contains fifteen counts and charges Livingston with criminal conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371, two counts of interference with interstate commerce by threats or violence in violation of 18 U.S.C. § 1951, two counts under 18 U.S.C. § 924(c)(1)(A)(i)-(ii) for use of a firearm during and in relation to a crime of violence, and one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g).  (See Doc. 1.)  On March 17, 2009, Livingston entered a plea of not guilty to the indictment.  (Doc. 56.)

Livingston now presents three pretrial motions for the court's review.  First, he claims that his arrest on April 20, 2008 was illegal and moves to suppress (1) the firearm seized during his arrest, (2) all evidence seized from the subsequent search of his apartment, and (3) the laptop computer provided to the police by Livingston's

7

mother.  (See Docs. 211, 247.)  In his second motion, Livingston moves to compel

the government to produce Brady material.  (Doc. 163.)  Finally, Livingston seeks

the production of information pertaining to other crimes, wrongs or acts potentially

admissible under Federal Rule of Evidence 404(b).  (See Doc. 165.)  Each of these

motions has been fully briefed and is ripe for disposition.

## II.    **Discussion**

### A.    **Motion to Suppress Evidence**

Livingston's motion to suppress focuses upon several distinct incidents of

purported misconduct.  First, he claims that it was unlawful for Susquehanna

Township police to enter his apartment without a warrant in order to effectuate his

arrest.  Livingston argues that this unlawful entry directly led to Adams' discovery

of the firearm beneath his mattress, and forced Livingston into a position wherein

he divulged information concerning Scherrer's use of a false name and outstanding

arrest warrants.  Police then arrested Scherrer, who divulged information

pertaining to Livingston's involvement in a January 2, 2008 home invasion robbery.

Livingston asserts that the discovery of the firearm and the information gleaned

from Scherrer after her arrest were the direct byproduct of his unlawful arrest, and

therefore constitute fruits of the poisonous tree.  Even if the acquisition of

information from Scherrer was lawful, however, Livingston claims that evidence

was seized from his apartment that was not authorized by the search warrant.

Finally, Livingston argues that the seizure of the laptop computer from his mother's

residence was unlawful, and the search of the computer's contents required a

separate warrant in order to comply with the Fourth Amendment.  He further

contends that the search and seizure of items from Constance's residence pursuant

to a search warrant was fruit of the poisonous tree by virtue of Livingston's

purportedly illegal arrest.  The court will address these arguments *seriatim*.

> 1. **Livingston's Arrest**

With limited exceptions, the Fourth Amendment's prohibition against

"unreasonable searches and seizures" requires officials to obtain a warrant before

searching persons or property.  See United States v. Arvizu, 534 U.S. 266, 573 (2002).

"Warrantless searches and seizures inside someone's home . . . are presumptively

unreasonable unless the occupants consent or probable cause *and* exigent

circumstances exist to justify the intrusion."  United States v. Coles, 437 F.3d 361,

365-66 (3d Cir. 2006); see also Illinois v. Rodriguez, 497 U.S. 177, 181 (1990)

(explaining that officers may enter a home without a warrant in order to make an

arrest if they obtain voluntary consent to do so); Payton v. New York, 445 U.S. 573,

589-90 (1980) ("In terms that apply equally to seizures of property and to seizures of

persons, the Fourth Amendment has drawn a firm line at the entrance to the

house.").  Consent to enter a residence may be granted by either the owner of the

premises or from a third party who retains common authority over the property.

Rodriguez, 497 U.S. at 181; United States v. Matlock, 415 U.S. 164, 171 (1974).  A

third party possesses common authority over a dwelling when he or she has "joint

access or control for most purposes."  Rodriguez, 497 U.S. at 181 (quoting Matlock,

415 U.S. at 171 n.7).  This authority may be actual or apparent; in other words, law

enforcement may rely on a third party's consent if it is objectively reasonable to believe that he or she has common authority over the residence. See Rodriguez, 497 U.S. at 188-89. The government bears the burden to prove that the individual granting consent possessed authority to do so. Id. at 181.

In the matter *sub judice*, the officers that entered Livingston's residence to effectuate his arrest were not armed with a warrant. However, the government claims that Scherrer lawfully consented to the entry when she voluntarily provided Wilson with a key to the apartment and stated, "this key opens the back door." (Doc. 257 at 6-7.) When Wilson asked Scherrer whether she lived in the apartment, she answered in the affirmative and indicated that she and Livingston were "live-in boyfriend girlfriend." (Id. at 14.) Based upon this evidence, the court finds that Scherrer had actual authority over the dwelling and consented for the officers to enter the residence. Dispositive in the court's inquiry is the fact that Scherrer readily furnished Wilson with a key to the apartment and told Wilson that she lived therein, demonstrating her joint access and mutual use of the residence.[4] As a result, the officers lawfully entered the apartment without a warrant.

---

[4] In his brief in support of the motion to suppress, Livingston avers that Scherrer "was not on the lease and did not pay any rent." (Doc. 247 at 7.) However, Livingston presents no actual evidence to rebut the government's proffer. Moreover, Scherrer's voluntary presentation of a key to the premises, coupled with the undisputed fact of her relationship with Livingston, are sufficient to establish the officers' objectively reasonable belief that Scherrer had common authority over the residence. See infra pp. 11-12.

Scherrer's consent was also given voluntarily; she provided the key of her own accord and without being asked to do so. Scherrer then repeatedly advised the police to use caution, and she told them precisely where Livingston stored his firearm. This conduct—which was not the product of police "prodding"—was clearly voluntary and strongly suggests that Scherrer's intent was to encourage the officers to enter the apartment and arrest its occupant.

Even if Scherrer did not possess actual authority to consent, however, Wilson and Adams reasonably believed she possessed such authority. Scherrer stated that she lived at the residence, described the interior of the residence for Wilson and Adams, and informed the officers of the location of Livingston's firearm. When Wilson explained that Livingston would be placed under arrest, Scherrer voluntarily offered up a key to the back door, cautioned the officers to proceed with care, and warned them that Livingston was potentially violent. Scherrer's familiarity with the physical layout of the apartment and with Livingston's typical early-morning behavior, as well as her unprompted provision of an apartment key all reasonably suggested that she possessed joint access and mutual use of the premises.

In short, Scherrer's consent permitted the officers to enter Livingston's apartment without a warrant and to effectuate his arrest.[5] Once inside the residence, Adams seized a firearm concealed beneath Livingston's air mattress.

---

[5] Livingston does not dispute that the officers possessed probable cause to arrest him.

Livingston argues that the seizure of this firearm was illegal, for it was not in plain view and its recovery exceeded the scope of the entry authorized by Scherrer. The court rejects Livingston's contention and finds that seizure of the firearm was lawful as a search incident to arrest.

Officers effectuating an arrest may conduct a "contemporaneous search without a warrant of the person arrested and of the immediately surrounding area" pursuant to the search incident to arrest exception. New York v. Belton, 453 U.S. 454, 457 (1981); Chimel v. California, 395 U.S. 752, 762-63 (1969) ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape."). Underlying the exception is the need to ensure officer safety; as the Supreme Court has explained, "[a] custodial arrest is fluid and 'the danger to the police officer flows from *the fact of the arrest*, and its attendant proximity, stress, and uncertainty.'" Thornton v. United States, 541 U.S. 615, 621 (2004) (emphasis in original) (quoting United States v. Robinson, 414 U.S. 218, 234-35 (1973)). The scope of a search incident to arrest must be "strictly tied to and justified by the circumstances which rendered its initiation permissible." United States v. Myers, 308 F.3d 251, 266 (3d Cir. 2002) (quoting Chimel, 395 U.S. at 762). Therefore, "[a] legitimate search incident to arrest is limited to the arrestee's person and to the area within his immediate control, meaning the area from which he might gain possession of a weapon or destructible evidence." Id. at 267 (quoting United States v. Hudson, 100 F.3d 1409, 1419 (9th Cir. 1996)).

12

Livingston was arrested approximately four to six feet from the location where his firearm was retrieved. When Adams discovered the weapon, Livingston was not yet fully restrained, and Adams testified that Livingston was "definitely within an area where he could lunge towards a weapon." (Doc. 257 at 32.) Furthermore, the officers had reason to believe that Livingston was armed and dangerous; Scherrer warned them that Livingston was "very violent and . . . scared of being robbed and . . . has a gun under the bed." (Id. at 6.) Scherrer also described Livingston as intoxicated and high on crack cocaine. Quite simply, the officers effecting Livingston's arrest were justifiably concerned that Livingston had a propensity for violence, *and* reasonably suspected that a loaded firearm was hidden mere feet from where Livingston was being placed into restraints. This combination of variables posed a serious safety risk to the officers, and clearly implicates the search incident to arrest exception's *raison d'etre*. See, e.g., Thornton, 541 U.S. at 620 (explaining that Belton "was justified by the need to remove any weapon the arrestee might seek to use to resist arrest or to escape"); United States v. Abdul-Saboor, 85 F.3d 664, 670 (D.D.C. 1996) (explaining that "[a] willful and apparently violent arrestee, faced with the prospect of long-term incarceration, could be expected to exploit every available opportunity, including any opening that enabled him to flee from one officer, run a few feet to the bedroom, and seize a deadly weapon"). Accordingly, the court finds that the officers' seizure of Livingston's loaded firearm was entirely appropriate.

### 2.    **Search of Livingston's Apartment**

Livingston contends that the search of his apartment was unlawful, and that several items were seized which were not particularized in the warrant.  With respect to the first contention, Livingston argues that the search warrant was based upon information provided by Scherrer, who was arrested and re-interviewed following Livingston's arrest.  During this second interview, Scherrer detailed Livingston's involvement in a January 2, 2008 home invasion robbery, and this information provided O'Connor with probable cause to obtain the warrant. Livingston claims that Scherrer never would have offered such incriminating information had she not been arrested on the outstanding arrest warrants.  The police only became aware of these warrants when Livingston divulged this fact after his arrest.  Thus, according to the defense, the information underlying the search warrant was obtained *because of* Livingston's arrest and therefore constitutes fruit of the poisonous tree.  However, the court has ruled that Livingston's arrest was lawful, see supra Part II.A.1, and Livingston does not claim that his post-arrest statements were obtained in contravention of the Fifth Amendment.  Therefore, this argument is easily rejected.

Livingston next assails the seizure of several items not identified within the four corners of the warrant.  The Fourth Amendment requires that a warrant particularly describe the items to be seized.  Massachusetts v. Snyder, 468 U.S. 981, 988 n.5 (1984).  The purpose of the particularity requirement is not only to prevent general searches, but also to "assure[] the individual whose property is searched or

seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." <u>Groh v. Ramirez</u>, 540 U.S. 551, 561 (2004). In the instant matter, police officers seized several items not identified in the warrant, to wit: (1) a large flat screen television and a receipt therefor, (2) Sony game controllers, (3) scales, (4) receipts and rental payments identifying Livingston as the resident at the address, (5) Livingston's social security card, and (6) a black Motorola cellular telephone. (<u>See</u> Doc. 213-2.) The government concedes that these items were not identified in the warrant, but contends that their seizure was lawful under the plain view exception.

The plain view exception to the Fourth Amendment allows "officers to seize incriminating evidence in plain view during the course of a lawful search because such a seizure 'does not involve an invasion of privacy.'" <u>United States v. Menon</u>, 24 F.3d 550, 559 (3d Cir. 1994) (quoting <u>Horton v. California</u>, 496 U.S. 128, 141 (1990)). A plain view seizure must satisfy three requirements before the evidence may be admitted:

> First, the officer must not have violated the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. Second, the incriminating character of the evidence must be immediately apparent. Third, the officer must have a lawful right of access to the object itself.

<u>Id.</u> (internal quotations and citations omitted). Because acquisition and execution of the warrant itself was legal, the first and third requirements are clearly satisfied.

The government argues that the incriminating nature of each of the above-referenced items was immediately apparent. During her post-arrest interview with

O'Connor, Scherrer described Livingston's involvement in what O'Connor recognized to be the January 2, 2008 robbery of Deborah Dobson ("Dobson"). According to Dobson, the perpetrators of the offense had bound her with wires from a Playstation gaming system and then stole an X-Box 360, Playstation, and a fifty-inch flat screen television.  (See Doc. 257 at 45-46.)  The government has presented no evidence that Sony controllers were taken during the January 2 robbery or during any other criminal endeavor in which Livingston was allegedly involved; therefore, this item was not of an incriminating nature and does not fall within the plain view exception.  Similarly, the government has presented insufficient evidence to establish that the incriminating nature of the scales was immediately apparent at the time of seizure.  There is no evidence that the scales were discovered alongside any additional drug paraphernalia or packaging supplies, or that there was any narcotics residue atop the scales or located inside the apartment.  See United States v. Snard, Crim. A. No. 09-cr-00212, 2009 WL 3105271, at *6 (E.D. Pa. Sept. 27, 2009) (finding plain view seizure when officer observed digital scales, plastic bags, and razor atop a table).  Thus, the government has failed to carry its burden under the plain view exception, and this item shall be suppressed.  In addition, the paperwork identifying Livingston as the building occupant is not incriminating, nor has the government seriously attempted to show that the seizure of the paperwork and social security card was lawful.  (See Doc. 213 at 10.)  Accordingly, discovery of the paperwork, identification, and social security card shall be suppressed.

In contrast, seizure of the flat screen television was justified at the time of the search. O'Connor testified that the appearance of the television was similar to the television that was reported stolen by Deborah Dobson, and its close proximity to masks, gloves, an X-Box 360, and a Playstation made it reasonable for the officers to conclude that the television was that which was stolen during the January 2 theft.[6] See United States v. Benish, 5 F.3d 20, 25 (3d Cir. 1993) (stating that the incriminatory character of the item must be immediately apparent "at the moment preceding the seizure"). In addition, seizure of the black Motorola cellular telephone was appropriate. The warrant identifies "any and all papers or *photographs* identifying who 'DC' is." (Doc. 213-2 (emphasis added)). O'Connor explained during his testimony that cellular telephones typically contain digital photographs, and that the telephone was seized so that it could be examined for such photographs. O'Connor stated that discovery of such evidence may identify Livingston's co-conspirators or accomplices, namely "D.C." (See Doc. 257 at 51-52.) As such, the cellular telephone falls within the parameters of the warrant, and is admissible at trial.[7]

---

[6] Although the court shall not suppress evidence of the flat screen television's seizure, the relevance of the evidence is highly questionable. Officers determined that the television seized in Livingston's apartment was not stolen during the January 2 robbery, (see id. at 54), and the government has thus far presented nothing to connect the television to any illegal activity.

[7] A cellular telephone was also stolen during the January 2 robbery and, as O'Connor testified, the telephone was subsequently identified by Deborah Dobson as belonging to her son. (See Doc. 257 at 51-52.)

In sum, the court shall suppress evidence that officers seized Sony game controllers, scales, various paperwork identifying Livingston, and Livingston's social security card. The government has failed to carry its burden to show that the incriminating nature of these items was immediately apparent at the time of seizure. However, the government may present evidence regarding seizure of the flat screen television and black Motorola cellular telephone.

### 3. Laptop Computer Seizure and Search of Constance's Residence

Livingston's final argument challenges the seizure of the laptop computer from his mother's residence on April 21, 2008, as well as the subsequent seizure of property from that residence on April 29, 2008 pursuant to a search warrant. Both arguments are premised upon Livingston's contention that his initial arrest was unlawful, and that any information recovered as a result of that arrest constitutes fruit of the poisonous tree. (See Doc. 257 at 13-15.) Again, the court has ruled that Livingston's arrest did not offend the Fourth Amendment. See supra Part II.A.1. Therefore, his fruit of the poisonous tree assertions are without merit.[8]

The court also rejects Livingston's challenge to the computer seizure, and finds that Constance voluntarily relinquished control of the laptop computer.

---

[8] Furthermore, Livingston fails to demonstrate standing to contest the seizure of the items taken pursuant to the search of his mother's home on April 29, 2008. Standing requires that a defendant possess a reasonable expectation of privacy in the place searched. See Rakas v. Illinois, 439 U.S. 128, 133-34 (1978). Livingston concedes that he did not have a reasonable expectation of privacy in his mother's residence, (see Doc. 247 at 13); thus, he cannot contest the search of that residence.

O'Connor testified that after Scherrer informed him that Constance was in possession of the laptop, he traveled to Constance's residence, knocked on the door, and "told her I wanted the laptop she took out of [Livingston's] apartment at 2004 Clayton Avenue." (Doc. 257 at 55.) According to O'Connor, Constance willingly complied. (See id.) O'Connor never stepped into the home, but instead remained on the porch during the entire exchange. (Id.) For her part, Constance claims that she was threatened with arrest if she refused to comply. (See Doc. 264 at 6.) However, the court observed the testimony of both O'Connor and Constance, and credits the narrative supplied by the former, which was consistent, detailed, non-evasive and, where appropriate, acknowledged those portions of the investigation that were inconclusive, (see, e.g., Doc. 257 at 54 (conceding police seized property that was not stolen)). In contrast, Constance's testimony was notable for the detail which it lacked,[9] as well as her visible annoyance with the government's inquiries. The court thus accepts O'Connor's version of events and finds that he requested the laptop and Constance consented to its seizure.

Even if Constance did not consent to the laptop's seizure, Livingston has no standing to challenge its acquisition by O'Connor. An individual who lacks a

---

[9] For example, Constance allegedly entered Livingston's apartment shortly after his arrest to remove items of value. (See Doc. 264 at 4.) She had no recollection of seeing an X-Box or Playstation, and did not specifically recall whether she saw the flat screen television—all items that were clearly visible and, according to O'Connor, electronically connected to one another near the television. (See Doc. 257 at 50.) This is especially curious in light of her assertion that there was scarcely anything of value in the apartment, for Livingston "didn't even have furniture." (Doc. 264 at 14.)

reasonable expectation of privacy in the place searched is foreclosed from invoking the protections of the Fourth Amendment. <u>United States v. Perez</u>, 280 F.3d 318, 337 (3d Cir. 2002). Quite simply, the defendant "who is aggrieved by an illegal search and seizure through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." <u>Rakas v. Illinois</u>, 439 U.S. 128, 133-34 (1978); <u>United States v. Baker</u>, 221 F.3d 438, 442 (3d Cir. 2000) (same). Livingston has acknowledged that he did not have a reasonable expectation of privacy in his mother's home, (<u>see</u> Doc. 247 at 13), and, therefore, he cannot be heard to complain about the acquisition of property therefrom.

Finally, Livingston moves to suppress the fruits of a warrantless search of the laptop's contents, but neither party has presented any evidence that police performed such a procedure. Presumably, a search occurred at some point, for the government asserts in its brief that "[t]he laptop computer was determined to be stolen." (Doc. 213 at 13.) However, the government proffered no evidence or testimony during the suppression hearing in support of this assertion, nor was there any indication that evidence was procured from the computer's hard drive.[10] The court is thus without sufficient facts to reach a disposition on this aspect of Livingston's motion, and will defer ruling until a future date. Accordingly,

---

[10] If the laptop was indeed stolen, Livingston has no reasonable expectation of privacy in its contents. <u>See</u> <u>United States v. Caymen</u>, 404 F.3d 1196, 1201 (9th Cir. 2005) (explaining that "a person lacks a reasonable expectation of privacy in the contents of a laptop computer he stole").

Livingston's motion is denied without prejudice to his right to re-raise the issue if the government attempts to present evidence garnered from a search of the laptop's contents.

**B.** **Motion to Compel *Brady* Material**

Livingston's next motion requests that the government forthwith produce material that it is required to disclose under Brady v. Maryland, 373 U.S. 83 (1963). (See Doc. 163.)  Specifically, Livingston seeks (1) a full and complete statement of all criminal conduct committed by any witness providing evidence in this matter, (2) the existence of cooperation agreements entered into with any witness, (3) information derogatory to the credibility of any individual providing evidence herein, and (4) evidence that any witness to one of the charged incidents failed to identify Livingston as a participant.  Under Brady, the government must disclose evidence that is materially favorable to the accused, including any impeachment and exculpatory evidence.  Youngblood v. West Virginia, 547 U.S. 867, 869 (2006) (per curiam).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Strickler v. Greene, 527 U.S. 263, 280 (1999) (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)).

In its response to Livingston's motion, the government acknowledges its duty of disclosure, but notes that all discoverable material shall be produced three days prior to trial.  (Doc. 187 at 5.)  This is customary practice in this district, and comports with Third Circuit authority holding that "[n]o denial of due process

21

occurs if <u>Brady</u> material is disclosed to [defendants] in time for its effective use at trial."[11] <u>United States v. Higgs</u>, 713 F.2d 39, 44 (3d Cir. 1983). The court finds that there is no reason to stray from standard practice in the instant matter, and will therefore permit the government to produce <u>Brady</u> material three days prior to trial. Given the government's averment that <u>Brady</u> materials will be provided at the appropriate time, the court will deny Livingston's motion to compel without prejudice.

### C. Motion to Compel Rule 404(b) Material

Livingston's final motion seeks to compel production of Rule 404(b) information. Rule 404(b) allows a party to offer evidence of other crimes, wrongs, or acts to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. <u>See</u> FED. R. EVID. 404(b). In a criminal prosecution, the government must provide a defendant with reasonable notice in advance of trial if it intends to offer evidence under this provision. <u>See id.</u> The government states in its opposition brief that it "is not aware of any 404(b) evidence which it intends to

---

[11] Under the Jencks Act, "no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500.

introduce."[12]  (Doc. 187 at 6.)  In light of the government's assertion, the court will deny Livingston's motion to compel without prejudice.

**III.   Conclusion**

For the foregoing reasons, the court concludes that Livingston's arrest on April 20, 2008 was lawful, and the subsequent recovery of his firearm was permitted by the search incident to arrest exception.  Officers later searched Livingston's apartment using a valid search warrant, but their seizure of Sony video game controllers, scales, paperwork identifying Livingston, and Livingston's social security card exceeded the authority conferred by that warrant.  In addition, the court finds that Constance Livingston voluntarily provided police with the laptop computer, and Livingston lacks standing to challenge the seizure of either the

---

[12] Of course, Rule 404(b) "does not extend to evidence of acts which are 'intrinsic' to the charged offense."  United States v. Cross, 308 F.3d 308, 320 (3d Cir. 2002).  In an indictment charging a criminal conspiracy, "acts are intrinsic when they directly prove the charged conspiracy."  Id.  Thus, Rule 404(b) imposes no obligation upon the government to produce evidence which directly proves Livingston's participation in the instant conspiracy.

computer or any items taken during a search of his mother's residence. Finally,

Livingston is not yet entitled to material encompassed by <u>Brady</u>, and the

government asserts that it is not in possession of material which it must disclose

pursuant to Federal Rule of Evidence 404(b).

      An appropriate order follows.

                                                      <u>S/ Christopher C. Conner</u>
                                                   CHRISTOPHER C. CONNER
                                                   United States District Judge

Dated:      April 30, 2010

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:09-CR-0072-03** |
| | : | |
| **v.** | : | **(Judge Conner)** |
| | : | |
| **DESHAWN LIVINGSTON** | : | |

## <u>ORDER</u>

AND NOW, this 30th day of April, 2010, upon consideration of the motions to suppress evidence (Doc. 211), for release of <u>Brady</u> material (Doc. 163), and for production of Rule 404(b) material (Doc. 165), filed by defendant DeShawn Livingston ("Livingston"), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. The motion (Doc. 163) for release of <u>Brady</u> material is DENIED.

2. The motion (Doc. 165) to produce Rule 404(b) material is DENIED.

3. The motion (Doc. 211) to suppress evidence is GRANTED in part and DENIED in part as follows:

   a. The motion is GRANTED with respect to the seizure of Sony video game controllers, scales, paperwork identifying Livingston, and Livingston's social security card, all of which were obtained during the search of Livingston's apartment.

   b. The motion is DENIED in all other respects.

     <u>S/ Christopher C. Conner</u>
CHRISTOPHER C. CONNER
United States District Judge